IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Kiener Maschinenbau GmbH, | ) | CHAPTER 15 |
| | ) | CASE NO. 24-56470-jwc |
| Debtor in a Foreign Proceeding, | ) | |
| | ) | |
| _____ | ) | _____ |
| | ) | |
| IN RE: | ) | |
| | ) | CHAPTER 15 |
| LACOM GmbH, | ) | CASE NO. 24-56473-jwc |
| | ) | |
| Debtor in a Foreign Proceeding, | ) | |
| | ) | |
| _____ | ) | _____ |
| | ) | |
| Phyllis Ann Bass, individually, and as | ) | |
| Executor of the Estate of Roy Glenn Bass, | ) | CONTESTED MATTER |
| deceased, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Kiener Maschinenbau GmbH and LACOM | ) | |
| GmbH, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | | |

**<u>PHYLLIS ANN BASS, INDIVIDUALLY, AND AS EXECUTOR OF
THE ESTATE OF ROY GLENN BASS (DECEASED), OBJECTION TO THE
PROVISIONAL RELIEF SOUGHT AND, MOTION FOR RELIEF FROM
AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362</u>**

COMES NOW, Movant Phyllis Ann Bass, individually, and as Executor of the Estate of

Roy Glenn Bass, deceased ("Bass" or "Movant"), and files this her Objection to the Provisional

Relief Sought in this Chapter 15 Cases and  files her Motion for Relief from the Automatic Stay

Pursuant to 11 U.S.C. § 362 (the "Motion") to allow her to finalize and liquidate her claims against Debtor in the U.S. District Court as defined below and to pursue recovery from any of Debtor's insurance policies, their proceeds, and assert her claim in the bankruptcy case and the German Insolvency Case.  In support of the Motion, Movant shows the Court as follows:

1.

This Court has jurisdiction over this case only if it recognizes the form proceeding to which Movant current objects but assuming *arguendo* this Court has jurisdiction, this Motion is brought pursuant to 28 U.S.C. §§ 157(b) and 1334. This Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

2.

On June 21, 2024 (the "Petition Date"), Kiener Maschinenbau GmbH ("Kiener"), filed a voluntary petition for relief under Chapter 15 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

3.

Also on June 21, Lacom GmbH ("Lacom") filed a voluntary petition for relief under Chapter 15 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

4.

Kiener is the parent of Lacom.  Collectively Kiener and Lacom are the "Debtors".

5.

Bass sued both Kiener and Lacom, the case was removed to the US District Court for the Northern District of Georgia, Atlanta Division, case no. 1:21-cv-00144-VMC, Judge Calvert

presiding (the "District Court Action") for the personal injury claims that resulted due to injury

and death of Mr. Roy Glenn Bass. The incident giving rise to this claim occurred on March 20,

2018 in Chatsworth, Georgia at a Mohawk carpet manufacturing plant.

6.

Movant has been advised that there is a $10,000,000.00 insurance policy available, and it

is an eroding policy. Attorney's fees in defense of the claim, and now the attorney's fees in this

Chapter 15 case, are being used to diminish the proceeds that could be available to the decedent's

heirs and estate.

7.

Movant is the only claimant under the policy. Neither Debtors nor their insurance carrier

have specified any other claimants unrelated to Movant's wrongful death claim.

8.

Movant has filed a claim in the German insolvency proceeding.  The English translation of

the Order authorizing the German Insolvency proceeding of Kiener, attached to the Declaration of

Patrich Wahren, states that creditors were to file notice of their claim by September 4, 2023. See

Notice of Filing of 1) Order Appointing Permanent Administrator, (II) Declaration of Patrick

Wahren in Support of the Debtor's Chapter 15 Petition and First Day Pleadings in Foreign

Proceeding, and (III) Declaration of Foreign Expert (the "Notice"), Exhibit B, Order ¶ 3. Although

the expert's English Translation stated creditor could file claims up to date prior to distribution to

creditors. Notice, Declaration of Foreign Expert, ¶ 18.

9.

On May 24, 2023, counsel for Kiener and Lacom filed a Suggestion of Bankruptcy in the

District Court Action, and moved that the District Court stay all proceedings in the District Court

or dismiss that action based upon comity. The District Court "decline[d] to act without additional information," and directed Kiener and Lacom to advise the District Court if they intended to file a Chapter 15 case within 21 days of the entry of the court's order. See Order of District Court entered May 26, 2023, (the "May 26th Order") attached hereto and incorporated herein as **Exhibit A**.

10.

On June 16, 2023 Kiener and Lacom responded to the May 26th Order stating that as there was no permanent insolvency administrator ("PIA") yet, and would not be until August 1, 2023 they could not meet the Court's time deadline.  On August 16, 2023, Kiener and Lacom filed a Notice of Filing of Orders Appointing Permanent Administrators in German Insolvency Proceedings for both Kiener and Lacom Court.[1]

11.

The applicable insurance policy states that it is pertinent only to claims occurring during the policy period of January 1, 2018 through December 31, 2018. It is Movant's understanding that they are the sole liability claim on this 6-year-old policy. That is, Movant is Debtors' sole creditor.

12.

Movant objects to the provisional relief of imposition of the automatic stay on Movant, as she is the sole creditor in this case, the District Court Action has been pending since 2020, the PIA, Patrick Wahren has been appointed permanently since at least August 2023, the insurance company and its counsel have been actively participating in the District Court Action  since the beginning, the assets of the Debtor have been apparently liquidated, and these Chapter 15 cases

---

[1]The Bankruptcy Court may want to voluntarily decline jurisdiction and request the District Court to take jurisdiction as the District Court has already been requested by the Debtors to review the German insolvency proceeding.

are done only for delay and not for any reasonable bases. Theses Chapter 15 cases are gamesmanship by Debtors. The PIA Wahren disputed the claim of Movant in the German proceeding, because it is unliquidated, but now seeks a stay to stop Movant from liquidating her claim. If Debtors seek to compel Movant to liquidate the claim in Germany, they will fail under *forum non conveniens. See Bavaria Yachts USA, LLLP v. Bavaria Yachtbau GmbH*, 575 B.R. 540 (Bankr. N.D.Ga. 2017). Mr. Bass was killed by the defective Lacom equipment in Dalton, Georgia. Most witnesses live in or around Dalton, and those who do not live nearby have already been deposed in the underlying wrongful death case. As stated by the Movant, years of discovery in the USDC case is complete and the parties are awaiting orders on pending motions and a trial date.

## RELIEF REQUESTED

Movant requests relief from the automatic stay of 11 U.S.C. § 362(a) so that she may liquidate all her claims against Debtors in the U.S. District Court Action and pursue satisfaction of any Judgment against any insurance policy held by Kiener and Lacom and the policy proceeds.

## ARGUMENT AND CITATION OF AUTHORITY

### I.     Recognition of the Chapter 15 Cases Is Not Warranted

In this case, the Debtors seeks additional authority under §1521. The Petition does seek to "apply sections 362 and 365(e) of the Bankruptcy Code in these Chapter 15 cases on a provisional basis, pursuant to sections 105(a), 1519(a) and 1521(a)(7) of the Bankruptcy Code." Verified Petition [Docket No. 4], proposed Order ¶ 7.  It is the scope of the stay under § 362 to which Movant objects. The reason to stay the District Court action is not well articulated. Importantly, the "Holt Settlement Demand" for policy limits minus the eroded amount as referenced relates only to the insurer, not the Debtor.  In other words, the insurance carrier, not the debtor, decides whether to settle the claim for its policy limits. The Debtor should encourage settlement using only

insurance policy limits for which it has already paid premium. The Debtor should not take action in a bankruptcy/insolvency proceeding in any court anywhere that would discourage ending the wrongful death litigation against it.

Movant is the only creditor. The continuation of these Chapter 15 cases diminishes daily the amount that could, but never does, compensate a family for the loss of a loved one. The delay causes Ms. Bass and her family continued harm. These Debtors knew about the insurance issues years ago. The German insolvency proceedings are not new. Since the failed mediation, a lower demand for policy limits has been made that seeks only proceeds from the insurance carrier. (See Settlement demands attached hereto and incorporated herein as **Exhibits B and C**.) There is no emergency. The recognition of these cases should be denied.   The failure of mediation is not new. There is no emergency. The recognition of these cases should be denied.

## II.      RELIEF REQUESTED

In the alternative, Section 362 of the Bankruptcy Code provides that the filing of a bankruptcy petition operates as a stay, applicable to all entities, of the commencement or continuation of judicial process. 11 U.S.C. §362(a). "On request of a party in interest and after notice and hearing, the court shall grant relief from the stay … such as terminating, annulling, modifying, or conditioning such stay… for cause." 11 U.S.C. § 362(d).

Movant requests entry of an order modifying, annulling or lifting the automatic stay pursuant to 11 U.S.C. § 362 in order:

      a.      To permit Movant to proceed uninterrupted against Debtor for the purpose of determining any further liability and damages in the U.S. District Court Action, Movant be allowed to oppose any post judgment motions of the Debtor;

      b.      To permit the prosecution and opposition of any appeal made or process; and

      c.      To permit Movant to pursue satisfaction of any Judgment entered against Debtor in the District Court Action from any insurance policy held by Debtor, any proceeds thereof, and to assert a claim against any available assets of Debtor in this bankruptcy case.

## III.    ARGUMENT

The Bankruptcy Code does not define "cause" for purpose of 11 U.S.C. § 362(d). A determination of whether "cause" exists is made on a case-by-case basis. *In re Aloisi,* 261 B.R. 504, 508 (Bankr. M.D. Fla. 2001). However, "it is well-established that the existence of pending-litigation against the debtor in a nonbankruptcy forum may constitute cause." *In re Coachworks Holdings, Inc.,* 418 B.R. 490, 492 (Bankr. M.D. Ga. 2009) (J. Walker) (internal citations omitted). *See also Sky Top Enters., LLC v. Citrus Tower Blvd. Imaging Ctr., LLC (In re Citrus Tower Blvd. Imaging Ctr., LLC)*, 460 B.R. 334, 339 (Bankr. N.D. Ga. 2011) (J. Diehl) (lifting the automatic stay to allow a civil suit to continue in another forum where a determination of the merits of the case was "critical" to the Chapter 11 case); Congress recognized this concept when drafting Section 362:

> It will often be more appropriate to permit proceedings to continue in their place of origin when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court form duties that may be handled elsewhere.

S. Rep. No. 989, 95th Cong., 2d Sess. At 50 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5836.

Further, actions which involve the rights of third parties will often be permitted to proceed in another forum. *In re South Oaks Furniture,* 167 B.R. 307, 309 (Bankr. M.D. Ga 1994)(J. Walker)(allowing a state court action to proceed where it involved a non-debtor guarantor defendant). Here, the District Court Action involves two Non-Debtor Co-Defendants who have

filed answers along with demands for a jury trial.

In analyzing whether cause exists to allow litigation to continue in another forum, courts have applied a three-part test taking into account (1) any "great prejudice" to either the bankruptcy estate or the debtor resulting from continuation of the civil suit (2) whether the hardship to the movant by maintenance of the stay considerably outweighs hardship to the debtor and (3) the creditor has a probability of prevailing on the merits. *Sky Top Enters., LLC*, at 339. Here, relief from the stay under § 362(d) is warranted because there is sufficient cause.

A.  Lifting the Stay Will Not Result In "Any Great Prejudice" to Debtor or its Estate.

Adjudicating the District Court Action in the District Court will not impose any "great prejudice" to Debtor or the estate as a bankruptcy estate is not considered to have an interest in proceeds of liability insurance policies. As one bankruptcy court noted, the debtor will not have a cognizable interest in the proceeds of the typical liability policy. "Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract." *15375 Memorial Corp.,* 382 B.R. 652, 687 (Bankr. D. Del. 2008 (quoting *Houston v. Edgeworth (In re Edgeworth),* 993 F.2d 51, 55-56 (5th Cir. 1993)); *Landry v. Exxon Pipeline Co.,* 260 B.R. 769, 786 (Bank. M.D. La. 2001)("[W]hen the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate... In the liability insurance context the debtor has no cognizable claim to the proceeds paid by an insurer on account of a covered claim").

Given an estate's lack of interest in the liability policy proceeds, courts typically hold that debtors do not suffer prejudice when creditors obtain stay relief to liquidate claims that are covered by such proceeds. *In re Jet Florida Systems. Inc.,* 883 F.2d 970, 975 (11th Cir. 1989). In *Jet Florida*, the Eleventh Circuit allowed relief from stay and found that a debtor is not prejudiced

by exposure to a liability claim, because the bankruptcy estate is not subject to any risk, which does not frustrate the policy of the Bankruptcy Code in giving the debtor a fresh start in his economic life. Further, when the policy proceeds will be available only to creditors with the type of claims covered by the policy, "there is no depletion of assets that would otherwise be available to satisfy general, unsecured claims, and there is therefore no reason to delay the creditor seeking to recover under the policy." *15375 Memorial,* 382 B.R. at 690.

Additionally, adjudicating the District Court Action in the District Court will not impose any "great prejudice" to Debtor or the estate, because the adjudication will allow Debtor to formulate a plan or bankruptcy exit strategy. Adjudication of liability and damages in the District Court Action is critical to this Chapter 11 Case given the likelihood of a large Judgment against Debtor in favor of Movant.

Furthermore, the District Court has jurisdiction over all of the parties, and claims in the District Court Action.  Interests of judicial economy dictate that the original forum; District Court, rather than the Bankruptcy Court, determine the issues of liability and the amount of Movant's claim.

If the stay is not lifted to allow the District Court Action to continue to finality, Movant will be precluded from finalizing the District Court Action against Debtor. The Bankruptcy Court does not have jurisdiction over the non-debtor defendants in the District Court Action. *See* 28 U.S.C. §157(b)(5). Interests of judicial economy dictate that the original forum, the District Court, rather than the Bankruptcy Court, determine the issues of liability and the amount of Movant's claim.

   B.  The Hardship to Movant by Maintaining the Stay Considerably Outweighs Any Hardship to Debtor.

Given the underlying facts of the District Court Action, Movant will suffer great hardship if

this Motion is not granted while Debtor will not suffer any hardship. Movant suffered the loss of her husband's life for which she has not been compensated. Movant is without adequate resources to cope with her damages while she waits for due compensation. Additional delay in obtaining a Judgment against Debtor and the Non-Debtor Co-Defendants compounds the already significant hardship that Movant suffered.

As the bankruptcy court explained in granting stay relief in *15375 Memorial,* a claimant under a liability policy will suffer prejudice from delay due to the "lost time value of money," as well as "the lapse of time in terms of its ability to effectively prosecute its claims. Witnesses and documents become unavailable." *15375 Memorial,* 382 B.R. at 690.

Finally, 28 U.S.C. § 157(b)(5) precludes this Court from trying the District Court Action. Personal injury claims, like those in the District Court Action, may only be tried before either the trial court in Georgia or the District Court in Georgia. 28 U.S.C. § 157(b)(5); *see also Protos v. Silver (In re Protos),* 2005 Bankr. LEXIS 3308, 11 n.2 (Bankr. N.D. Ga. 2005).

C.   Movant Is Likely to Prevail on The Merits.

With respect to this prong of the analysis, courts hold that a slight probability of success on the merits may be sufficient to grant stay relief given the facts in a particular case. *Downey Financial Corp.,* 428 B.R. 595, 610 (Bankr. D. Del. 2010). In this case, the Debtor's industrial machine broke and killed the Movant's husband.  The Movant has a high probability of success on the merits of her product liability claims.  Lacom has not moved for summary judgment on all claims. The case will be tried on all or some of Movant's allegations of negligence and product liability.

D.   Additional Facts Support a Finding of Cause for the Court to Lift the Stay.

In this case, "cause" exists based upon additional reasons:

1.      Relief would result in complete resolution of the issues by determining Debtor's liability.

2.      Relief would not interfere with the bankruptcy case and may assist in the judicial expedition of the bankruptcy proceeding. Given Movant's claim for wrongful death damages in the District Court Action, the Judgment may be substantial. Such a claim will impact Debtor's reorganization efforts.

3.      Liquidation of Movant's claims in the District Court Action will not prejudice the interests of the other creditors.  Movant is by far the largest creditor of the Debtor.

4.      The interests of judicial economy and the expeditious and economical resolution of litigation weigh heavily in favor of adjudicating Movant's claims in the District Court Action. If the automatic stay is not lifted, judicial economy will be thwarted by starting anew, the multiplicity of claims and forums, as well as addressing the jury trial issue.

### III.      CONCLUSION

Movant would prefer the Court to decline to recognize the Foreign Proceeding as only Movant and no other creditors, as there are none, will be affected, and it will not necessarily assist the German Court proceeding to stay Movant's District Court Action.

Alternatively, Movant requests that the Court grant it relief from the automatic stay without the necessity of a ten day stay, all as authorized by the provisions of Federal Rules of Bankruptcy Procedure 4001(a)(3). Movant, by and through its counsel, waives the requirements of 11 U.S.C. § 362(e) which would otherwise require a hearing on the Motion within thirty (30) days. The Movant waives such provisions and consents to the automatic stay (and any related co-debtor stay) remaining in effect with respect to Movant until such time as the Court orders otherwise. This will allow the insurance carrier the ability to settle Movant's wrongful death case,

thus ending the litigation against Debtor altogether.

WHEREFORE, Movant requests and prays this Court decline to recognize these Chapter 15 cases and dismiss the same, or Movant prays for relief including entry of an order modifying, annulling and/or lifting the automatic stay pursuant to 11 U.S.C. §362, without limitation in order:

a) To permit Movant to proceed uninterrupted against Debtor for the purpose of determining any further liability and damages in the U.S. District Court Action, Movant be allowed to oppose any post judgment motions of the Debtors;

b) To permit the prosecution and opposition of any appeal made or process;

c) To permit Movant to pursue satisfaction of any Judgment entered against Debtors in the District Court Action from any insurance policy held by Debtors, any proceeds thereof, and to assert a claim against any available assets of Debtors and will modify Movant's claim in the German proceedings; and

d) To grant Movant such other and further relief as is just and proper.


Respectfully submitted,

**McBRYAN, LLC**

/s/Louis G. McBryan
Louis G. McBryan, Georgia Bar No. 480993
6849 Peachtree Dunwoody Road
Building B-3, Suite 100
Atlanta, GA 30328
Telephone (678) 733-9322
lmcbryan@mcbryanlaw.com
**Attorneys for Movant**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**EXHIBIT**

**A**

exhibitsticker.com

PHYLLIS ANN BASS, individually,
and as Executor of the ESTATE OF
ROY GLENN BASS, deceased,

     Plaintiffs,

v.

LACOM GMBH, KIENER
MASCHINENBAU GMBH, DSM-
NIAGA VOF, DSM COATING
RESINS, B.V.,

     Defendants.

Civil Action No.
1:21-cv-00144-VMC

## ORDER

This matter is before the Court on Defendants Kiener Maschinenbau GmbH ("Kiener") and LACOM Gmbh's ("Lacom") Suggestion of Bankruptcy. (Doc. 80). Kiener and Lacom's notice indicates that on May 16, 2023, Kiener (the parent company of Lacom) "commenced an insolvency proceeding" in a German court. (Doc. 80 at 1-2). Kiener and Lacom ask the Court to give effect to the German court's automatic stay provision and either stay the action or dismiss it without prejudice on the basis of comity. (*Id*. at 2).

The Court declines to act without additional information. The Court hereby directs the Parties as follows:

No later than 21 days after the date of entry of this Order , Kiener and Lacom are directed to indicate to the Court whether they expect a case under Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will be commenced to recognize the German insolvency proceeding, and if so, the expected timing of such filing. If they do not anticipate that a Chapter 15 case will be filed, they must submit further briefing on the issue of why the Court should act to stay or dismiss this case in the absence of such a filing within the same time period.

Plaintiff may respond to Kiener and Lacom's Suggestion of Bankruptcy and the additional briefing described above by filing a single response brief within 14 days after Kiener and Lacom's additional briefing is filed.

The Clerk is directed to submit this matter to the undersigned upon the expiration of 35 days after the date of entry of this Order.

**SO ORDERED** this 26th day of May, 2023.

Victoria Marie Calvert
United States District Judge

2



EXHIBIT

B

E. Scott Slappey | James (Jay) Sadd | Richard E. Dolder | Edward M. Wynn
Michael Keller | Daniel M. Epstein | Brian K. Cunha | Hon. James G. Tunison

## OFFER TO SETTLE LAWSUIT AND TORT CLAIM

May 12, 2023

*Via Certified Mail Article No.7020 2450 0001 7067 6102*
*and email to ljones@taylorenglish.com*
Aon Risk Solutions
DSM-Niaga VOF
DSM Coating Resins, B.V.
c/o LeeAnn Jones
Taylor English Duma, LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339

*Via Certified Mail Article No. 7020 2450 0001 7067 6119*
*and email to wfox@hpylaw.com*
XL Insurance Company Limited
Lacom GmbH
Kiener Machinenbau GmbH
c/o Warner Fox
Hawkins Parnell & Young
303 Peachtree Street, N.E.
Atlanta, GA 30308-3243

RE:   **Phyllis Ann Bass, *et al.* v. Lacom GmbH, *et al.***
      ***U.S. District Court, Northern District of Georgia***
      ***Case No. 1:21-cv-00144-VMC***

Dear LeeAnn and Warner:

This will serve as our clients' demand to DSM-Niaga VOF (n/k/a Covestro Niaga B.V.) and DSM Coating Resins, B.V. (n/k/a Covestro Coating Resins, B.V.) (hereinafter collectively referred to as "Niaga"), Aon Risk Solutions ("Aon"), and Defendants Lacom GmbH and Kiener Machinenbau GmbH (hereinafter collectively referred to as "Lacom"), and XL Insurance Company Limited.

This demand provides Niaga and Lacom and any insurer(s) with a reasonable opportunity to promptly settle our clients' substantial claims prior to trial.

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **2**

Please be advised that because this letter is sent for the purposes of negotiating a potential settlement, any statements contained herein or attached as exhibits are inadmissible at any trial of this case per O.C.G.A. § 24-4-408.

It is our understanding that the general and product liability insurance policy limits available to protect the Niaga Defendants from a larger judgment is Twenty-Five Million Euros (€25,000,000.00), with no other excess or umbrella coverage available. This understanding and our reliance is predicated on information provided by Defendant Niaga and Aon, and we are expressly relying on your representation that policy limits are the amount stated. If the applicable policy limits are greater or less than the amount specified herein, please let us know your position within 10 days of receipt of this letter, as this information could materially alter the amount and other content of this demand.

It is our understanding that the general and product liability insurance policy limits available to protect the Lacom Defendants from a larger judgment is Ten Million Euros (€10,000,000.00), with no other excess or umbrella coverage available. This understanding and our reliance is predicated on information provided by Defendant Lacom and XL Insurance Company Limited, and we are expressly relying on your representation that policy limits are the amount stated. If the applicable policy limits are greater or less than the amount specified herein, please let us know your position within 10 days of receipt of this letter, as this information could materially alter the amount and other content of this demand.

Pursuant to Georgia law, we are providing to you a reasonable opportunity to promptly settle substantial claims against all Defendants for an amount within policy limits. By timely accepting this offer, Defendants will be protected from personal responsibility to pay a judgment in excess of policy limits; protracted litigation;  the time and expense of attending further depositions, participating in further discovery and attending trial; the emotional cost attendant to reliving the incident and the harm caused to others; financial loss and other damages attributed to credit reports and ratings; litigation costs and attorneys' fees; and other losses typically caused by a failure to timely settle claims.

## I.   <u>FACTS & LIABILITY</u>

 Defendant Niaga is a startup company located in The Netherlands. They created a process for manufacturing carpet that is 100% recyclable. Defendant Lacom designs and manufactures heavy industrial machinery.  Lacom is headquartered in Germany.  Their sales total $130-150 million per year.

Niaga partnered with Lacom to scale up the machinery needed to make fully recyclable carpet using the Niaga process.  As part of this partnership, Mohawk Industries, Inc. ("Mohawk") was the Defendants' first carpet manufacturing customer.  Defendants sold Mohawk, among other things, a laminator, a fiber binder, and special adhesive for Mohawk to use in manufacturing recyclable carpet with Niaga's unique process.  This was the first time Mohawk endeavored to produce carpet with any equipment or supplies from Lacom or Niaga. This process was so new

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | 3

that even Niaga did not know what they were doing. (Frans Depo., p. 63-64). Under the Defendants' direction and supervision, the Lacom equipment was installed into a Mohawk production line in February/March 2017.

The machine that broke and killed Glenn Bass was the Lacom laminator. At the time of the incident, the Lacom laminator was producing defective carpet using the Niaga process. The purpose of the Lacom laminator was to marry the tufted carpet a/k/a "greige goods" to backing in order to make a sturdier finished product. In this case, the greige goods entered the machine through the bottom of the laminator, the backing entered through the top, and molten Niaga adhesive was applied to glue the two components together.

Lacom stands for laminating and coating machines. They are experts in the design, manufacture, and operation of laminating and coating machines. Niaga is an expert as to the proprietary process for producing recyclable carpet using their adhesive. Niaga also assisted with the design of the fiber binder. Because this was a new process for Mohawk, using machines they've never used before, Mohawk relied heavily on the Defendants for getting the machines to produce merchantable carpet. Mohawk also relied on the Defendants to provide training regarding the safe operation and use of the Lacom laminator. (Bush Depo. 2, p. 61); (Bradshaw Depo. 2, p. 34); (Sethna Depo. 2, p. 44-45).

Production of defective carpet was a problem since the Lacom laminator and fiber binder were installed at the Mohawk plant in February/March 2017 through well after the subject incident. The main cause of the defective carpet was wrinkles in the finished product coming out of the Lacom laminator. (Sethna Depo. 2, p. 71). Mohawk relied on the Defendants' expertise, direction and advice in determining various fixes for the wrinkled product coming out of the Lacom laminator.

Wrinkled, defective carpet continued to be a major problem well after Glenn Bass's death in March 2018. For example, On July 4, 2018, a Niaga employee stated ███████████████████
███████████████████████████████████████████████████ (DSM0007485). Niaga even hired a consultant on July 19, 2018 to come up with a solution to the wrinkling defects. (MHK00026028). However, this did not solve the problem and failure to produce merchantable carpet using Niaga's never used before technology became so intolerable that Mohawk sent Niaga a demand letter on August 28, 2018, entitled "Defective Equipment and/or Adhesives Sold to Mohawk under the NIAGA TECHNOLOGY LICENSE AND SUPPLY AGREEMENT between DSM-Niaga V.o.F. and MOHAWK INDUSTRIES, INC. dated August 23, 2016 (the "Agreement")." (MHK 00026082). Niaga remedied the claim. (Hall Depo., p. 56).

On March 20, 2018, Glenn Bass died when two heavy industrial steel rollers broke off a laminator and crushed him. The laminator was designed and manufactured by Defendant Lacom and sold by Defendant Niaga.

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **4**

Starting in 2012, Glenn Bass was a senior electrician at Mohawk, a carpet manufacturing company located in the carpet capitol of the world, Dalton/Chatsworth, Georgia.  Mohawk has been a part of the North Georgia community for over 30 years.

On March 20, 2018 at around 8:00 a.m., Glenn Bass was trying to get the production line started when he noticed wrinkled product coming out of the Lacom laminator.  Glenn called Kevin Bradshaw over to assist with troubleshooting the production defects.  (Bradshaw Depo. 2, p. 63-64, 89).



*This snapshot was taken just seconds before the machine broke.  Mohawk employee, Kevin Bradshaw is at the top of the video and Glenn Bass is at the bottom.  Wrinkles are visible in the finished carpet coming out of the Lacom laminator above Mr. Bradshaw's head.*

To determine the cause of the defective carpet feeding out of the laminator, Mr. Bradshaw and Mr. Bass had to look into the machine from the outfeed side, while the line was moving.  (Bradshaw Depo. 2, p. 89-90).  Mohawk employees had no reason to believe that this was an unsafe place to stand.  Mohawk employee, Mike Sethna testified that he stood in that spot hundreds of times for the primary purpose of troubleshooting wrinkles in the laminator.  (Sethna Depo. 2, p. 38-39).  In fact, this area was used as a walkway, and Mr. Sethna testified that he saw both Lacom and Niaga employees in that exact same position.  (Sethna Depo. 2, p. 39).  Furthermore, both Lacom and Niaga released a marketing video showing the owner of Lacom standing underneath similar rollers, while the machine is running product.  In December 2017, Niaga filmed a video at

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **5**

Mohawk of their consultant doing the exact thing that Glenn and Bradshaw were doing at the time of the incident.



*Snapshot of Jurgen Kiener, owner of Lacom, taken from Niaga and Lacom's marketing video.*



*Comparison of Lacom/Niaga video and Mohawk video.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **6**



*Snapshot of Niaga's December 2017 video at Mohawk. Carpet is running through the Lacom laminator during this video. The person to the left is a Niaga consultant. The video was shot by Niaga employee, Chris Reutelingsperger.*

On March 20, 2018, while troubleshooting the malfunctions in the Lacom laminator, Bradshaw suddenly heard something unusual. The carpet began to tear. Bradshaw had no time to pull the emergency stop cord on the back of the laminator. Instead, he yelled at the operator to stop the machine and moved away at the last second. Tragically, Glenn Bass was not so lucky, as the bearings and mounts on his side of laminator ruptured just before Bradshaw's side of the laminator, causing two heavy industrial steel rollers to come crashing down onto Glenn's head and chest. Mohawk employees ran to remove the rollers from Glenn's body and began chest compressions, while someone called 911. Mr. Bass died from his injuries.

Video from the incident shows the carpet slowly reversing direction as the wrinkles disappear and the slack in the carpet begins to tighten just before the carpet tears and the rollers break. The Lacom laminator was designed to toggle and operate in reverse, and the Defendants never warned Mohawk not to reverse the Lacom laminator. (Watson Depo., p. 169-170). In fact, reversing the laminator in such a way was a foreseeable, intended and expected use of the laminator. (Kuhn Depo., p. 69-70); (Ankenbrand Depo., p. 120-121) (Bradshaw Depo. 2, p. 28-29).

To the extent Defendants allege operator error was the cause of the incident, Defendants were contractually obligated to train Mohawk's operators regarding the safe use and operation of

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **7**

the Lacom laminator.  (Hall Depo., p. 101-102).  Any alleged operator error would be attributable to the Defendants' negligent training and failure to warn.  Steffen Kuhn was the Lacom employee, who was mainly responsible for training Mohawk's operators.  (Kuhn Depo., p. 54-55); (Reutelingsperger Depo., p. 83); (Ankenbrand Depo., p. 44).  Mr. Kuhn testified that his training simply consisted of reviewing the Lacom Manual.  (Kuhn Depo., p. 52-53, 56); (Ankenbrand Depo., p. 43).  However, Scottie Watson, the operator of the Lacom laminator on the day of the incident, testified that he was not trained by anyone at Lacom or Niaga regarding how to operate the Lacom laminator.  (Watson Depo., p. 169).  Moreover, the Defendants never warned him not to operate the laminator in reverse.  (Watson Depo., p. 169-170); *See* (Niaga Corp. Rep. Depo., p. 114) (stating that the laminator can be jogged in reverse, but Niaga did not provide any warnings regarding the jog feature).  Moreover, there is nothing in the Lacom Manual that says not to run or jog the laminator in reverse.



*The snapshot above is a split second before the rollers break and hit Glenn.  Kevin Bradshaw is at the far end of the screen wearing an orange vest.  You can see the carpet is already tearing. The roller on top of Mr. Bradshaw is the second roller that broke.  At this moment, it is still intact.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **8**



*This is a snapshot from the moment the first roller broke and crushed Glenn.  Glenn's side of the
laminator broke first and landed on top of him.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **9**





JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **10**



Glenn Bass died, because two heavy industrial steel rollers broke off the Lacom laminator and struck Glenn.  The rollers broke off Defendants' machine because, the bearings and mounts holding the rollers in place fractured. The fractures should not have occurred. This is an obvious defect.

After the incident, Mohawk made changes to the Lacom laminator that could have and should have been implemented by the Defendants prior to the incident.  Specifically, the bearings and mounts that fractured in the incident were flange bearings.  After the incident, Mohawk installed sturdier and safer pillow block bearing with support gussets and roll catchers.

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **11**



*The rollers that broke off the Lacom laminator and struck Glenn. The blue bearings are fractured.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023

P a g e  | **12**



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **13**



*The blue flange bearings holding the rollers in place fractured in multiple locations.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **14**



*The bearings were attached to this support mount.  Some bolts were still in place after the incident.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **15**



*Pillow block bearings, support gussets, and roll catchers installed after the incident.*

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **16**

 

*Comparison of flange bearing installed prior to the incident (left) and pillow block bearing
installed after the incident (right).*

Bearings, mounts, and rollers should never be able to break off a heavy industrial machine such as the Lacom laminator. Lacom and Niaga should have anticipated loads during normal and abnormal uses that could have foreseeably resulted in the rollers breaking off of the laminator. At the very least a warning should have been provided. Lacom's Corporate Representative on the subject of warnings confirmed that such a warning was never provided. (Steinheber Depo., p. 36-37, 58-59). In fact, Lacom did not even know the amount of force it would take to break the bearings, mounts, and rollers. (Steinheber Depo., p. 37). Mr. Steinheber stated that the warning was not necessary, because "the breaking of a roller is not a foreseeable situation," but goes on to admit what should be obvious to industrial machine designers, that "anything operated and loaded with too much force can break." (Steinheber Depo., p. 59).

Lacom and Niaga knew or should have known the load at which the bearings would fail, and should have programmed their laminator to shut off prior to reaching that breaking point. This certainly could have been done prior to the incident. (Steinheber Depo., p. 22, 24, 39) (stating that there were load cells in the laminator that he was responsible for programming, and he could have programmed the load cells to shut off the laminator). This is something that Mohawk requested from the Defendants after the incident. (DSM 0005887).

At the very least, the Defendants should have warned Mohawk that the rollers could break under x amount of tension/force, which could have allowed Mohawk to program shut off points

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **17**

on equipment adjacent to the Lacom laminator.  But the Defendants never calculated whether the bearings and mounts could withstand the max amount of torque that could be exerted on the rollers at Mohawk. (Milde Depo., p. 67-69). This is something that was done by the Defendants at Niaga's facility in Geleen, but it was never done at Mohawk.  (DSM 0007273); (Milde Depo., p. 66).

The bottom line is that foreseeable carpet production defects were happening in the Lacom laminator at an exceedingly higher rate than normal.  These foreseeable problems should have been considered by the Defendants when designing their equipment, selling their equipment, designing their warnings, and training Mohawk operators.  Instead, the Defendants' failures caused Glenn Bass' death.

## II.      <u>SEVERE INJURY AND LOSS OF HUMAN LIFE CAUSED BY THE DEFENDANTS</u>

Phyllis Bass is the surviving spouse of Glenn Bass.  Their daughter, Jessica was 17 years old at the time of her father's death.  Phyllis is bringing a wrongful death claim for the full value of the life of her husband, Glenn, who was just 59 years old at the time of his gruesome death.  Phyllis is also bringing a claim on behalf of Glenn's Estate for the pain and suffering experienced by Glenn from the time he was crushed by the 1,000 lbs. rollers to the time of his death.

Glenn Bass was born in Tennessee.  He served in the U.S. Navy from 1976-1980, and then in the reserves until 1982.  Glenn worked hard to receive various degrees and certifications as an electrician.  He started his own electrical company, Custom Industrial Service, Inc. in 1997.  He worked there with his brother from 1997 to 2012.  Aside from running the business, his job duties also included installation and repair of electrical equipment.  Phyllis Bass also worked with Glenn at his company, where they enjoyed being together 24 hours a day.

Glenn joined Mohawk in 2012 and worked there until his death on March 20, 2018.  Glenn worked hard to provide for his family, often having to work long hours and weekends.  He loved working at Mohawk.  Glenn was dedicated to his job and genuinely enjoyed learning about electrical engineering and design principles.  He had a thirst for knowledge and would often bring work manuals and blueprints home on his own accord. As an employee, he went above and beyond, just as he had lived the rest of his life.

Phyllis and Glenn met just after Glenn was honorably discharged from the Navy.  They were married on January 10, 1981.  They had a deeply loving and caring relationship.  Glenn was truly a happy person.  On Sunday's he would attend church with Phyllis when he wasn't working.  Glenn's mission in life was to make Phyllis happy.  He was an exemplary person and family man.

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023

P a g e | **18**



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023

P a g e  | **19**



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **20**



 While trying to start a family, Phyllis and Glenn lost 2 children due to health complications. Undeterred and unselfishly, Phyliss and Glenn decided to begin fostering children.  They fostered 15 children in total.  This is how they came to adopt their daughter, Jessica.  Phyllis and Glenn fostered Jessica when she was just 7 weeks old.  They completed the adoption process a year later.

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **21**



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **22**



    Jessica was everything to Glenn.  When she was younger, he would coach her basketball teams and help with other sports.  As she got older, they enjoyed talking about books, movies, and life in general.  Glenn was an avid fisherman and also liked to hunt.  Although Jessica did not enjoy fishing, she would often accompany her dad just to enjoy his conversation.  Jessica and her dad also shared a love for painting, something they valued doing together as much as they could. Glenn was a proud father.  He would attend high school football games just to watch his daughter in the marching band.  Every night the family would hang out together, often watching movies and TV.  Phyllis testified that Jessica "was a daddy's girl.  She had him wrapped around her finger— around his finger.  Anything she wanted.  She loved her daddy." (Phyllis Bass Depo., p. 33).

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023

P a g e | **23**





JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023

P a g e   | **24**





JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **25**



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **26**



Jessica deeply revered her father and the love he had for Phyllis. Jessica testified that they always seemed happy together. She always admired how her dad would work hard during the day but would still come home and help Phyllis with chores around the house.

In the summer, the family would spend time outdoors together. Phyllis and Glenn especially enjoyed gardening. They grew fruit, flowers, and vegetables in their garden. Glenn was also a big history buff. As a result, metal detecting was one of his favorite hobbies. Phyllis and Glenn would often search their neighbors' property for old artifacts. Glenn also enjoyed watching football and NASCAR. He even raced cars when he was younger. In fact, Glenn and Phyllis used to work together at a racetrack in Chatsworth. Glenn's passion for life, learning, curiosity, and constant good will toward others makes his passing before his time ever more catastrophic.

Glenn was very close to his two brothers, Ronald and Roger. When they were younger, they rode motorcycles and played all types of sports. As they got older, they enjoyed talking on the phone and spending time together. Phyllis said that they were like "three peas in a pod." They

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e **| 27**

were all also very close to their mother, Betty Sue.  Betty Sue is 84 years old.  Glenn would visit
Betty Sue as much as he could.  Family meant the world to Glenn.  He was loved by all he knew.
His friends describe him as loyal, hardworking, devoted, skillful, and smart, with an extreme love
for his family, and for God.



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023

P a g e  | **28**



JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e  | **29**

When determining the value of Glenn's life and the special moments that will be forever missed, Jessica put it best:

> But it has affected me not only in the way that I lost my main provider, but I lost one of my best friends.  And I didn't have my license at the time.  My dad didn't get to teach me how to drive.  My dad didn't get to watch me graduate high school.  He'll never be at my wedding.  My future grandkids will never meet their grandfather.  And I will never see my parents grow old together.  And I will never see him retire.  And I think about those things every single day.

(Jessica Bass Depo., p. 56).

### III.   <u>MATERIAL TERMS OF SETTLEMENT</u>

We are providing this reasonable opportunity to settle all claims against Defendants DSM-Niaga VOF (n/k/a Covestro Niaga B.V.), and DSM Coating Resins, B.V. (n/k/a Covestro Coating Resins, B.V.), Aon Risk Solutions, Defendants Lacom GmbH and Kiener Machinenbau GmbH, and XL Insurance Company Limited under the terms below. Please note that some of the material terms are conditions of acceptance and not conditions of performance.  If you fail to timely perform a condition of acceptance, there will be no settlement and we will be forced to obtain and collect a judgment against the Defendants well in excess of the insurance coverage available.  **<u>Time is of the essence for each and every condition.</u>**

1.   You have until 9:00 AM EST, June 8, 2023 to provide to us a written statement as to whether you agree to all of the terms of this offer.

2.   The amount of monetary payment demanded for this enormous loss is Twenty-Five Million Euros (€25,000,000.00) to be paid by Aon Risk Solutions; and Ten Million Euros (€10,000,000.00) to be paid by XL Insurance Company Limited.

> The payment must be made payable to "Phyllis Bass and her attorneys Slappey & Sadd, LLC."  The monetary payment must be actually received on Phyllis' behalf by the undersigned on or before June 19, 2023.  Our timely receipt of payment is an essential element of acceptance.  If you do not ensure that we receive timely payment within the deadline there will be no settlement, and we will be forced to proceed with the pending civil lawsuit against the Defendants.

3.   Each insurance carrier must respond in writing as to each layer of coverage with whether they agree to this offer, however, this offer of settlement can only be accepted if all carriers accept the terms of this offer. The offer is conditioned on all carriers accepting. We strongly suggest each carrier consult *Cotton States Mutual Insurance Company v. Brightman*, 580 S.E.2d 519 (2003):

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **30**

> "We hold that an insurance company in a case involving multiple
> insurers may be liable to its insured on a bad faith claim when it fails
> to tender its policy limits in response to a settlement offer solely
> because the offer also seeks the policy limits from other insurers….
> In addition, industry experts agree[ ] that, in cases involving
> multiple defendants and insurance companies, one insurance
> company can offer its policy limits in response to a demand—"put
> our money on the table"—and then let the plaintiff negotiate with
> the remaining insurers….. [W]e conclude that an insurance
> company faced with a demand involving multiple insurers can
> create a safe harbor from liability for an insured's bad faith claim
> under *Holt* by meeting the portion of the demand over which it has
> control, thus doing what it can to effectuate the settlement of the
> claims against its insured."

4.   The parties to be released if this offer is accepted by all insurance carriers is DSM-Niaga VOF (n/k/a Covestro Niaga B.V.), DSM Coating Resins, B.V. (n/k/a Covestro Coating Resins, B.V.) Lacom GmbH, and Kiener Machinenbau GmbH, and all affiliated companies, their employees, agents and insurers.

5.   The type of release offered is a full liability release.

6.   The claims to be released are all claims that have been made or could have been made in the pending lawsuit against DSM-Niaga VOF (n/k/a Covestro Niaga B.V.), DSM Coating Resins, B.V. (n/k/a Covestro Coating Resins, B.V.), Lacom GmbH, and Kiener Machinenbau GmbH, their owners, agents and employees.

## **DEMAND PURSUANT TO O.C.G.A. § 51-12-14**

This demand is additionally made pursuant to O.C.G.A. § 51-12-14.  If you fail to accept this demand and timely pay the amount demanded, this demand is automatically withdrawn and we will seek interest on the amount demanded.

This firm's Tax Identification Number is: 20-3359975.  We will be happy to provide a signed W-9 upon your request, but your request does not extend any time limits under this offer.

We look forward to your timely response.

With Professional Regards,

James (Jay) Sadd
Michael Keller

JNS/MAK to WF and LJ
Bass v. Lacom GmbH, *et al.*
May 12, 2023
P a g e | **31**

JS/MAK
cc:    Phyllis Bass



SLAPPEY & SADD
LLC
www.lawyersatlanta.com
Toll Free (888) 474-9616          Fax (404) 255-7340

E. Scott Slappey | James (Jay) Sadd | Richard E. Dolder | Edward M. Wynn
Michael Keller | Daniel M. Epstein | Brian K. Cunha | Hon. James G. Tunison

EXHIBIT
C
_____

## OFFER TO SETTLE LAWSUIT AND TORT CLAIM

June 14, 2024

*Via Certified Mail Article No. 7020 2450 0001 7067 6058*
*and email to wfox@hpylaw.com and canderson@hpylaw.com*
Warner S. Fox, Esq.
Carl H. Anderson, Jr., Esq.
Hawkins Parnell & Young
303 Peachtree Street, N.E.
Atlanta, GA 30308-3243

> RE:  **Phyllis Ann Bass, et al. v. Lacom GmbH, et al.**
> **U.S. District Court, Northern District of Georgia**
> **Case No. 1:21-cv-00144-VMC**

Dear Warner and Carl,

Based on representations made, it is our understanding that Lacom's policy limits are eroding. The purpose of this letter is to make a policy limits demand for the entire remaining eroded amount, so long as that amount exceeds $8 million. This entire remaining policy limits demand will remain open for 14 days upon your receipt of this demand.

Perhaps there are additional existing unpaid expenses that would further erode the policy limits. These possible existing unpaid expenses are knowable so as to allow the calculation of the true remaining limits amount. Those calculations should be included in the final policy limits amount covering this policy limits demand.

This offer to settle includes the right for our client to evaluate the reasonableness of expenses claimed to have eroded the policy. Please provide a written list of eroding expenses to us within 10 days of this letter. You may redact information at your discretion that is objectively protected by the attorney client privilege, work product doctrine, or some other privilege or confidentiality claim that objectively exists.

Payment must be made within 40 days of your receipt of this letter. In exchange, our client agrees to dismiss Lacom, Kiener and their affiliates with prejudice from the pending lawsuit and provide a general release.

JNS/MAK to WSF and CHA
Bass v. Lacom GmbH, *et al.*
June 14, 2024
P a g e | **2**

      I can be reached at anytime at 404.276.2000 (cell).


                With Professional Regards,


                James (Jay) Sadd, Esq.


JNS/MAK
cc:    Phyllis Bass

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing **PHYLLIS ANN BASS, INDIVIDUALLY, AND AS EXECUTOR OF THE ESTATE OF ROY GLENN BASS (DECEASED), OBJECTION TO THE PROVISIONAL RELIEF SOUGHT AND, MOTION FOR RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362** using the Bankruptcy Court's Electronic Case Filing program, which sends a notice of this document and an accompanying link to this document to the following parties who have appeared in this case under the Bankruptcy Court's Electronic Case Filing program:

Cameron M. McCord
cmccord@joneswalden.com, jwdistribution@joneswalden.com;ljones@joneswalden.com;cparker@joneswalden.com;lpineyro@joneswalden.com;bdernus@joneswalden.com

Jason L. Pettie jpettie@taylorenglish.com

Via Email:
Dr. H. Philipp Esser LL.M.
PEsser@schultze-braun.de

This 26th day of June 2024.

Respectfully submitted,

**McBRYAN, LLC**

/s/Louis G. McBryan
Louis G. McBryan, Georgia Bar No. 480993
6849 Peachtree Dunwoody Road
Building B-3, Suite 100
Atlanta, GA 30328
Telephone (678) 733-9322
lmcbryan@mcbryanlaw.com
**Attorneys for Movant**